

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2001 JAN 31 AM 10: 23
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CARGILL FERROUS INTERNATIONAL, A DEPARTMENT OF CARGILL INCORPORATED | * <br> * | CIVIL ACTION <br> NO. 00-0247 |
| VERSUS | * | SECTION "C" |
| M/V EMMA OLDENDORFF, HER ENGINES, TACKLE, APPAREL, ETC., *IN REM*, OLDENDORFF B. COASTAL CARGO CO., AND GOLDEN STEVEDORES, *IN PERSONAM* | * <br> * <br> * | MAGISTRATE (2) <br> JUDGE BERRIGAN <br> MAG. WILKINSON |

**MOTION FOR SUMMARY JUDGMENT TO DISMISS RULE 14(c) TENDER AND TO STAY OR DISMISS THIRD-PARTY COMPLAINT PENDING ARBITRATION**

**NOW INTO COURT**, through undersigned counsel, comes Metall und Rohstoff Shipping RSA (PTY) Limited ("MUR"), made third-party defendant herein, making only a limited appearance with a full reservation of all rights, defenses and exceptions, and moves this Honorable Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing defendant/third-party plaintiff's, Egon Oldendorff (Hong Kong) Limited's ("Oldendorff"), Rule 14(c) tender of MUR to the plaintiff, and to stay or dismiss Oldendorff's third-party complaint against MUR, on the grounds that the

___Fee
___Process
X Dktd
✓ CtRmDep
Doc.No. 27

undisputed material facts establish that Oldendorff's 14(c) tender of MUR to the plaintiff is time barred, and Oldendorff's third-party complaint against MUR is subject to a mandatory arbitration agreement, entitling MUR to judgment as a matter of law dismissing the 14(c) tender and staying or dismissing the third-party complaint pending arbitration, all as more fully set forth in the attached memorandum.

Respectfully submitted,

MURPHY ROGERS & SLOSS

Peter B. Sloss #17142
Suite 400, One Shell Square
701 Poydras Street
New Orleans, Louisiana 70139
Telephone: (504) 523-0400
Attorneys for third-party defendant, Metall und Rohstoff Shipping RSA (PTY) Limited

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have on this 31st day of January 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, either by hand, by telefax or by placing same in the United States Mail, properly addressed, and first class postage prepaid.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CARGILL FERROUS INTERNATIONAL, A DEPARTMENT OF CARGILL INCORPORATED** | * * | **CIVIL ACTION** **NO. 00-0247** |
| **VERSUS** | * | **SECTION "C"** |
| **M/V EMMA OLDENDORFF, HER ENGINES, TACKLE, APPAREL, ETC., *IN REM*, OLDENDORFF B. COASTAL CARGO CO., AND GOLDEN STEVEDORES, *IN PERSONAM*** | * * * | **MAGISTRATE (2)** **JUDGE BERRIGAN** **MAG. WILKINSON** |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT TO DISMISS RULE 14(c) TENDER AND TO STAY OR DISMISS THIRD-PARTY COMPLAINT PENDING ARBITRATION**

**MAY IT PLEASE THE COURT:**

Metall und Rohstoff Shipping RSA (PTY) Limited ("MUR"), making only a limited appearance with a full reservation of all rights, defenses and exceptions, submits that Egon Oldendorff (Hong Kong) Limited's ("Oldendorff") Rule 14(c) tender of MUR to the plaintiff is time barred and must be dismissed, and that Oldendorff's third-party complaint against MUR is subject to a mandatory arbitration clause and must be stayed

or dismissed pending arbitration.

**BACKGROUND**

The plaintiff herein, Cargill Ferrous International, A Department of Cargill, Inc. ("plaintiff"), filed this suit on 26 January 2000 against Oldendorff, Coastal Cargo Co., Inc. ("Coastal") and Golden of Louisiana, Inc. (misnamed Golden Stevedores) (hereafter "Golden") claiming damage to a cargo of prime newly produced hot rolled deformed bars shipped onboard the M/V EMMA OLDENDORFF from Durban, South Africa to New Orleans, Louisiana. (See Complaint (Doc. 1)). Plaintiff alleged that the cargo was loaded onboard the M/V EMMA OLDENDORFF in Durban, South Africa on or about 31 December 1998 in good order and condition, but was delivered in New Orleans on or about 27 January 1999 in a damaged condition, and that further damage was incurred during discharge in New Orleans. (Id., ¶¶7-8) Plaintiff sued Oldendorff under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §1300 *et. seq.*, and Coastal and Golden, the discharging stevedores in New Orleans, under the General Maritime Law of the United States. (Id., ¶9).

On 19 December 2000, nearly two years after the cargo was discharged, Oldendorff filed its Third-Party Complaint against MUR. Oldendorff claims that MUR, as charterer of the M/V EMMA OLDENDORFF, owes Oldendorff contribution and/or indemnity for any liability Oldendorff might have to the plaintiff. (See, Third-Party Complaint (Doc. 22)). Oldendorff also tendered MUR to the plaintiff pursuant to Rule

14(c) of the Federal Rules of Civil Procedure. (Id.).

At the time of the voyage at issue in this suit, MUR had time-chartered the M/V EMMA OLDENDORFF from Oldendorff pursuant to a New York Produce Exchange form time charter party dated 26 November 1998. The charter party provided, at Clause 17, Lines 107-109:

> That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons in London, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be Members of the London Maritime Arbitrators' Association.

(See, Sworn Statement of Melpomeni Peterson, attached hereto, at ¶4, and Charter Party, Exhibit "A" thereto.)

Two things are readily apparent from this background. First, any claim the plaintiff might now bring against MUR would be time-barred, coming well after COGSA's requirement that suit be brought within one year from the date of delivery of the cargo. 46 U.S.C. §1303(6). MUR did not grant plaintiff or Oldendorff any extensions of the suit limitation period. (Sworn Statement of Melpomeni Peterson, at ¶3). As a result, Oldendorff's 14(c) tender is time barred and must be dismissed. Second, Oldendorff's third-party claim against MUR is subject to the mandatory arbitration clause in the charter party. Oldendorff's Third-Party Complaint must,

therefore, be stayed or dismissed pending arbitration of Oldendorff's claim against MUR.

## ARGUMENT

Rule 56 of the Federal Rules of Civil Procedure requires summary judgment if the record discloses no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). In addition, if the party opposing the motion fails to establish an essential element of his case, summary judgment is proper. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552 (1986).

The record in the instant case clearly establishes that Oldendorff's 14(c) tender must be dismissed as time barred, and that Oldendorff's third-party claim against MUR must be stayed or dismissed pending arbitration.

1. **Oldendorff's Rule 14(c) tender of MUR to the plaintiff must be dismissed as time barred.**

Rule 14(c) of the Federal Rules of Civil Procedure provides:

> (c) **Admiralty and Maritime Claims**. When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, **in which event the third-party defendant shall make any defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.** (emphasis added).

Thus, Oldendorff's third-party tender of MUR to the plaintiff pursuant to Rule 14(c) is treated as if the plaintiff sued MUR directly. MUR is entitled to assert all defenses that it has against the plaintiff's claims.

In the instant case, the cargo in question was carried in foreign trade to a U.S. port. It is undisputed that "COGSA applies to all bills of lading or similar documents that evidence contracts of carriage of goods by sea in foreign trade to and from United States ports." Thyssen Steel Co. v. M/V KAVO YERAKAS, 50 F.3d 1349, 1354 (5th Cir. 1994), citing 46 U.S.C. §1300. Thus, COGSA applies to the instant lawsuit because the subject cargo was shipped in foreign trade to a U.S. port.

Under COGSA, plaintiff had one year to bring suit against MUR. Specifically, 46 U.S.C. §1303(6) provides:

> In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.

Given that the cargo was delivered to plaintiff on or about 27 January 1999, and MUR was not tendered as a direct defendant to plaintiff until 19 December 2000, nearly two years later, any claim plaintiff would have against MUR is time-barred. As a result, Oldendorff's 14(c) tender of MUR to the plaintiff is time barred, and the Rule 14(c) tender must be dismissed.

This specific issue was addressed in Marubeni American Corp. v. M/V OHFU, 1996 AMC 1051 (S.D.N.Y. 1996). The plaintiff in that case brought a claim against the owners of the vessel, Tokai Shipping Company, Ltd., for damage to steel wire rods carried aboard the M/V OHFU. Thereafter, Tokai filed a third-party complaint against Eastwind, who operated and/or otherwise controlled the M/V OHFU, making a claim for indemnity and contribution. As in the instant case, the third-party complaint was filed more than one year after the cargo was delivered. The court held that because the one year statute of limitations barred claims by the original plaintiff against the third-party defendant, the third-party plaintiff's tender of the third-party defendant under Rule 14(c) must be dismissed as time barred. M/V OHFU, 1996 AMC at 1056.

The same situation arose, with the same result, in Mitsui & Co. (U.S.A.), Inc. v. M/V CROWN ROSE, 1996 WL 732842 (E.D.La. 1996). The plaintiff in that case, Mitsui, sued Shinwa and ACBL for damage to steel coils shipped aboard the M/V CROWN ROSE from Japan to New Orleans. The cargo was discharged in New Orleans in March 1993, but Shinwa impleaded Nitta and Dream Shipping, the operators of the vessel, in May 1995 and tendered those defendants to the plaintiff pursuant to Rule 14(c). Judge Clement granted Nitta's and Dream Shipping's motion for summary judgment dismissing the 14(c) tender on the grounds that any claim the plaintiff might have against Nitta and Dream Shipping was time-barred under COGSA, and, therefore, Shinwa's 14(c) tender was also time-barred. 1996 WL 732842 at p. 1.

The OHFU and CROWN ROSE decisions are directly on point and are dispositive of the time bar issue in this case. Oldendorff's Rule 14(c) tender of MUR to plaintiff cannot circumvent the established statute of limitations. As explicitly stated by the OHFU court, "plaintiff cannot use Rules 9(h) and 14(c) to circumvent the statute of limitations." 1996 AMC at 1056. Because any claim by plaintiff against MUR is time barred, Oldendorff's 14(c) tender is also time barred and must be dismissed.

**2.    Oldendorff's third-party complaint must be stayed or dismissed pending arbitration.**

Since Oldendorff's 14(c) tender must be dismissed as time barred, the only remaining claim against MUR is Oldendorff's third-party claim for contribution and indemnity. But the applicable charter party mandates arbitration of that claim in London. Accordingly, under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§1-16, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"), enforced pursuant to 9 U.S.C. §201 et seq., this Court must stay or dismiss Oldendorff's third-party demand pending arbitration.

Federal courts have strongly supported resolution of disputes by arbitration, rather than litigation, and have consistently enforced arbitration agreements. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927 (1982); Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449 (1974); Sedco v. Petroleos Mexicanos Mexican National Oil Co. (Pemex), 767 F.2d 1140, 1145-46 (5th Cir. 1985). Courts entertain a strong presumption in favor of arbitration, and require that arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue . . .". Sedco., 767 F.2d at 1145, quoting Commerce Park of DFW Freeport v. Martin Construction Co., 729 F.2d 334, 338 (5th Cir. 1984), quoting Wick v. Atlantic Marine, Inc., 605 F.2d 166, 168 (5th Cir. 1979).

The FAA, Section 2, states that a written provision in "any maritime transaction ... shall be valid, irrevocable and enforceable . . .". 9 U.S.C. §2. The definition of "maritime transaction" in Section 1 of the FAA specifically includes charter parties and bills of lading of water carriers. 9 U.S.C. §1.

There can be no reasonable dispute that the 26 November 1998 charter party between Oldendorff and MUR is a "maritime transaction" as defined in Section 1 of the FAA. Consequently, the arbitration agreement at Clause 17 of that charter party "shall" be enforced under Section 2 of the FAA.

The arbitration provision in the charter party is also enforceable under the Convention. In Sedco, the Fifth Circuit set forth the criteria for enforcing an arbitration clause under the Convention:

> The Convention contemplates a very limited inquiry by the courts when considering a motion to compel arbitration;
>
> 1. Is there an agreement in writing to arbitrate the dispute; in other words, is the arbitration agreement broad or narrow;
>
> 2. Does the agreement provide for arbitration in the territory of a Convention signatory;
>
> 3. Does the agreement to arbitrate arise out of a commercial legal relationship; and
>
> 4. Is a party to the agreement not an American citizen?
>
> (Citation omitted). If these requirements are met, the Convention requires the district courts to order arbitration.

767 F.2d 1144-45 (emphasis added). Applying these criteria, the Fifth Circuit has repeatedly enforced arbitration agreements in charter parties, including the NYPE arbitration clause. See, e.g., E.A.S.T., Inc. v. M/V ALAIA, 876 F.2d 1168 (5th Cir. 1987). See also, Complaint of Hornbeck Offshore (1984) Corp., 981 F.2d 752 (5th Cir. 1993); Sedco, supra.

It is clear that all of the Sedco criteria are present in the captioned case. First, the arbitration provision in the charter party requires arbitration of "any dispute" between Oldendorff and MUR. Such "broad" language clearly encompasses this cargo damage dispute. Complaint of Hornbeck Offshore, 981 F.2d at 754-55; Sedco, 767 F.2d at 1145-46. Thus, the charter party between Oldendorff and MUR clearly contains "an agreement in writing to arbitrate" this dispute.

The other Sedco criteria are also present: The charter party provides for arbitration in London, England, a signatory to the Convention; the agreement arises out of a maritime charter party, a commercial legal relationship; and the parties to the agreement are not American citizens. Because all of the Sedco criteria are present here, the Convention mandates arbitration of this dispute. 9 U.S.C. §206; Sedco, 767 F.2d at 1145.

Where, as here, a dispute is subject to arbitration, litigation of that dispute must be stayed pending the outcome of the arbitration. 9 U.S.C. §3, made applicable to proceedings under the Convention by 9 U.S.C. §208. In Sedco, the Fifth Circuit held

that a stay of all litigation, pending the conclusion of arbitration, was required under the FAA and the Convention:

> Both the Arbitration Act and the Convention provide that if a dispute in a pending lawsuit is subject to arbitration, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had."

767 F.2d at 1146, quoting 9 U.S.C. §3. See also, Mid-West Mechanical Contractors v. Commonwealth Construction Co., 801 F.2d 748, 751 (5th Cir. 1986). The stay provision is mandatory. Complaint of Hornbeck Offshore, 981 F.2d at 754. This Court must, therefore, stay litigation of Oldendorff's third-party complaint against MUR pending arbitration of the dispute between those parties.

Alternatively, this Court can dismiss, rather than stay, the third-party complaint. Dismissal is particularly appropriate where, as here, all claims asserted in the third-party complaint must be arbitrated. Marubeni v. M/V OHFU, 1996 AMC at 1056, citing Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992). Because all of Oldendorff's claims against MUR are subject to mandatory arbitration under the charter party, this Court should dismiss rather stay the third-party complaint.

## CONCLUSION

In sum, MUR was not tendered to plaintiff under FRCP 14(c) until after the statute of limitations on plaintiff's claims against MUR had run. Thus, any claims which plaintiff may have had against MUR are time barred. Accordingly, Oldendorff's 14(c)

tender of MUR is also time barred and must be dismissed.

Moreover, Oldendorff's third-party claim against MUR for indemnity and contribution must be stayed or dismissed pending London arbitration. Oldendorff entered into a binding and enforceable time charter party which contained a mandatory arbitration clause. Oldendorff's third-party claim against MUR here clearly falls within the broad language of that arbitration clause. Thus, Oldendorff must assert its claims for contribution and indemnity against MUR in London arbitration, and its third-party claim here must be stayed or dismissed.

Respectfully submitted,

MURPHY ROGERS & SLOSS

Peter B. Sloss #17142
Suite 400, One Shell Square
701 Poydras Street
New Orleans, Louisiana 70139
Telephone: (504) 523-0400
Attorneys for third-party defendant, Metall und Rohstoff Shipping RSA (PTY) Limited

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I have on this 31st day of January 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, either by hand, by telefax or by placing same in the United States Mail, properly addressed, and first class postage prepaid.

# Time Charter

**CALL SIGN : ELOG7**

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913—Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party,** made and concluded in JOHANNESBURG 26th day of November, 1998 Between EGON OLDENDORFF (HONG KONG) LIMITED, HONG KONG Owners of the good Liberian Flag, Built 1983 ~~Steamship~~ Motorship M.V. "ERNA OLDENDORFF" of ... of 18,220 tons gross register, and 10,855 tons net register, having engines of ... indicated horse power and with hull, machinery and equipment in a thoroughly efficient state, and classed First Class Korean Register (See Clause 60) and Charter Party and no survey work due either now or later which could affect Class during the prescribed service. ~~at ... of about ... cubic-feet bale capacity, and about ... tons of 2240 lbs. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity, allowing a minimum of fifty tons) on a draft of ... feet ... inches on ... Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about ... tons of fuel, and capable of steaming, fully laden, under good weather conditions about ... knots on a consumption of about ... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil, now~~ trading ((See Clause 60 – Vessel's Description))

and METALL UND ROHSTOFF SHIPPING RSA (PTY) LTD Charterers of the City of JOHANNESBURG

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for ~~about~~ One Time Charter trip via safe port(s), always within I.N.L., always afloat. Duration about 40/50 days without guarantee. Intention cargo Steels/Generals within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owner's obligations hereunder.

Vessel to be placed at the disposal of the Charterers, ~~at~~ when, where, ready, Charterer's option on dropping last outward sea pilot Durban any time day or night, Sundays and holidays included (subject to current Charterer's agreement to X where, when, ready if same declared) ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be~~ X Vessel on arrival first load port to be ready to receive ordinary cargo with clean-swept holds and tight, staunch, strong and in every way fitted for ~~the service~~, having water ballast, ~~winches and~~ cranes donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the ~~winches~~ at one and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise ~~including petroleum or its products, in proper containers, excluding~~ See Clause 56 for Cargo Exclusions ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers)~~, in such lawful trades, between safe port and/or ports ~~in British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America ... and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~ World Trading within Institute Warranty Limits (See Clause 58). Redelivery: on dropping last outward sea pilot safe port Tampa/Vera Cruz range, port in Charterer's option, any time day or night, Sundays and holidays included

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service. whilst on hire

2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, watchmen, garbage removal, municipality and state taxes, stevedoring tallymen, boatage, towage, canal dues, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~

Charterers are to provide necessary dunnage and shifting boards at their time/expense/responsibility, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ... tons and not more than ... tons and to be re-delivered with not less than ... tons and not more than ... tons~~ See Clause 59

See Clause 20

EXHIBIT A

tabbies

~~tons and to be re-delivered with not less than~~ ........ ~~tons and not more than~~ ........ ~~tons~~ See Clause 59

4 ~~That the Charterers shall p~~ ~~or the use and hire of the said Vessel at the rate of~~ ........ See Clause 29

~~United States Currency per ton on vessel's total dea.. weight carrying capacity, including bunkers and stores, on~~ ........ ~~summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at~~ ........ Frankfurt

........ ~~unless otherwise mutually agreed. Charterers are to give Owners not less than~~ ........ days ~~notice of vessels expected date of re-delivery, and probable port~~ (15 days) (15 days)

5. Payment of said hire to be made in ~~New York~~ in cash in United States Currency ~~semi-monthly~~ in advance, and for the last ~~half month~~ or part of same the approximate amount of hire, ~~and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers,~~ otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, at their discretion subject to 2½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any ~~time of tide, except at such places where it is customary for similar size vessels to safely lie aground.~~ See Clause No. 70

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners~~ ........ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ No Passengers

8. ~~That the~~ Notwithstanding anything herein contained to the contrary, the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency, and Charterers are to load, stow, ~~and trim~~ and discharge, tally, dunnage, lash/unlash and secure the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of ~~$1.00~~ USD 10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman etc., Charterers paying ~~at the current rate per meal, for all such victualling.~~ See Clause 65

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. ~~That the Captain shall use diligence in caring for the ventilation of the cargo.~~

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ........

........

~~on giving written notice thereof to the Owners or their Agents~~ ........ ~~days previous to the expiration of the first-named term, or any declared option.~~

14. That if required by Charterers, time not to commence before 10th December, 1998 0000 Hours ........ and should vessel not have ~~given written notice of readiness~~ delivered on or before 16th December, 1998 2400 Hours ........ ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. (Vessel's ETA OBN 4th Dec AGW to disch bagged rice under TC Unisaf, ETR 11th Dec AGW - Agents Freight-marine)

15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons ~~at New York,~~ in London one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be ~~commercial men~~ Members of the London Maritime Arbitrators' Association. English Law to apply.

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled in London according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1974, or any amendments thereto ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier ... for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

amendments thereto

the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.

In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. [Hire not to contribute to General Average.]

20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

No drydocking except in emergency

22. Owners shall maintain the gear of the ship as fitted [See Description Clause] providing gear (for all derricks [cranes]) capable of handling lifts up to three tons [as described], also providing ropes, falls, slings and blocks [as on board]. If vessel is fitted with derricks [cranes] capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. [electric light, day and night as on board] The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all winches [cranes] to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches [crane or cranes] or insufficient power to operate winches [cranes], Owners to pay for shore engine [crane], or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

U. S. A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both-to-Blame Collision Clause

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging.

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, [acts of pilots and tugboats] insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of 2½ [1,25] per cent is payable by the Vessel and Owners to Alnarine Shipping, Johannesburg ................................ on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of 2½ [3,75] per cent payable to Charterers ................................ on the hire earned and paid under this Charter.

Clauses 29 - 78, and Description Clause of vessel as attached form part of this Charter Party.

For and on behalf of the Owners

EGON OLDENDORFF

ppa. ppa.

– as agent only –

Metall und Rohstoff Shipping RSA (Pty) Ltd
187 Rivonia Road, Morningside,
Sandton, 2196, South Africa
Tel: (27 11) 302-0130
Fax: (27 11) 883-1545
Tlx: 420617 MUR SA

(4)

Printed by Witherby and Company Limited,
32-36 Aylesbury Street, London EC1R 0ET
By permission of the NEW YORK PRODUCE EXCHANGE

ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.

29. HIRE

a. Charterers shall pay for the use of the vessel at the rate of USD 6,700 daily including overtime, payable to Owner's bankers, commencing from the day/time of her delivery payable every 15 days in advance or pro rata for any part of a day up to the day/time of her redelivery. GMT will apply on delivery and redelivery respectively.

b. In the event of a default in the payment of hire, Owners are to telex Charterers informing them of the default. Owners are not to withdraw the vessel if Charterers make good the default within three clear bank working days or provide a guarantee to secure the alleged under or non-payment within such period.

c. Hire and bunkers on delivery to be paid telegraphically by Charterers in U.S. Dollars to the account of Egon Oldendorff (Hong Kong) Ltd, Hong Kong, account with Citibank AG, Neue Mainzer Str. 75, 60311 Frankfurt, Account No. 150 1273 003, under telex advice to Egon Oldendorff Luebeck, Telex 26411 EOLUE D.

30. In the event of drydocking or other necessary measures to maintain the efficiency of the vessel, deficiency of men or Owners or strikes of Officers or crew or disputes with Unions or Associations concerned or connected with Owner's affairs, or strikes of Officers or crew whether due to labour dispute or otherwise, real or suspected breakdown of machinery, damage to hull, grounding or other accidents, either hindering or preventing the efficient working of the vessel, no hire to be paid in respect of any time lost thereby during the period in which the vessel is unable to perform the service immediately required.

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers for any reason, the hire to be suspended from the time of her putting back or deviating until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

31. GEAR CERTIFICATES

On delivery the vessel to provide a valid test certificate covering vessel's gear for the period of this Timecharter in accordance with the International Dock Safety Convention and vessel to comply with the safety regulations and/or requirements ruling at all ports of call, failing which Charterers shall have the option to refuse the vessel until Owners renew such certificates in which case Owners to pay for all extra expenses incidental to and resulting from such failure and any time lost thereby to be for Owner's account.

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

32. TRADING CERTIFICATES

Owners to supply all valid international trading certificates, including safety equipment, safety radio, loadline cargo gear and deratisation exemption certificates, also national registration certificates. In the event that the vessel is presented without aforesaid valid certificates, any time lost to be for Owner's account. Charterers reserve their right to decline to accept the vessel into their service until Owners renew such certificates. If deratisation certificate provided on delivery of the vessel does not cover the whole period of the Timecharter and because of this fumigation becomes necessary, cost of same and detention to be for Owner's account. Master and crew are always to be provided with vaccination and similar health certificates which may be required at the ports of call.

33. VESSEL DETENTION

Should the vessel be seized and/or detained and/or geographically constrained in relation to her service by any government or body (whether legally constituted or not) or by any persons acting out of malicious, belligerent or political motive or as a result of any action by any such government body or persons, the vessel shall be off-hire for all time thereby lost and fuel oil/diesel oil consumed and all port charges whilst off-hire for Owner's account. If such period exceeds 15 days Charterers to have the option of cancelling this Charter Party provided no cargo on board. Any hire paid in advance and not earned shall be refunded to Charterers immediately on demand.

34. HOLD CONDITION

a. Owners guarantee vessel's holds will be clean swept, fresh water washed, clean and dry and ready and suitable to independent surveyor's satisfaction for permitted cargo on vessel's arrival at load port, failing which vessel is to be off-hire until accepted by same authorities, but this should not apply to ballast hold.

b. Owners agree not to paint the vessel's holds prior to or during the currency of this Charter Party without Charterer's express permission.

35. GEAR BREAKDOWN

In the event of a breakdown of derrick or derricks, winch or winches or crane or cranes for a period by reason of disablement or insufficient power, the hire to be reduced

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

pro rata for the period of such insufficiency in relation to the number of hatches available.

If Charterers continue working by using shore gear, such to be for Owner's account but then the vessel not to be off-hire pro rata as stipulated above, vessel is, however, to be pro rata off-hire if shore gear is not available during stoppages of derrick or derricks, winch or winches, crane or cranes. Time lost by stevedores as a result of such breakdown of derrick or derricks, winch or winches or crane or cranes, to be for Owner's account.

36. CREW DESERTION

In case of desertion of Officers and/or crew members, any expenses incurred to be for Owner's account and if outlaid by the Charterers (partly or fully) same to be refunded by Owners immediately or deducted by Charterers from the next hire payment. Any time lost in connection with desertion to be for Owner's account.

37. Owners to be responsible for losses sustained by vessel through negligence of pilots or tugboatmen who shall be deemed to be the servants of the Owners and under their instructions for any damages caused to berths, tugs, pilot boats or other vessels, etc., at ports of call, whether pilot on board or not and for any fines and/or claims arising therefrom. Owners to be responsible for any fines whatsoever in the event of smuggling acts by their own Officers and/or crew, Owner's passengers and/or stowaways (Refer Cl. 74), and Owners to remain responsible for detention of the vessel due to smuggling and any other expenses arising from these acts. Charterers to be similarly responsible in respect of Charterer's representatives and/or servants.

38. Vessel is entered with United Kingdom Mutual Steamship Assurance Association, Bermuda Ltd, and is covered in respect of Owner's liability for personal accidents or injuries incurred by third parties on board or about the vessel.

39. WAR RISKS

All war risk premiums in force on the date of this Charter Party shall be for Owner's account. Additional war risk premiums arising thereafter by reasons of the vessel trading under Charterer's instructions in areas designated by the War Risk Association of London, and/or the Hellenic War Risk Association, as war risk areas, to be for Charterer's account. Charterer's responsibility for additional premiums shall be confined to premiums in respect of risks of physical loss or damage to the vessel

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

and/or crew. Liability for premiums in respect of trapping and blocking and/or loss arising therefrom shall in all circumtances remain for Charterer's account. Any extra crew war bonus to be for Charterer's account.

Under this Clause Owners declare the following valuation and number of crew if necessary which, for insurance purposes, to remain unchanged throughout the period of the Charter:

a. vessel, hull and machinery value US$ 10 Mio
b. number of crew - 23, including Master

Charterers shall pay to Owners nett additional premiums, as provided in this Clause against Owner's Underwriter's original invoices, less any commission, or discount, rebates allowable to Owners and/or their agents/managers by their Underwriters, always provided that such premiums are calculated at a rate not in excess of rates ruling in London for identical insurance cover.

40. WAR

In the event that the nation under whose flag the vessel sails should engage in hostilities or warlike operations (whether war is declared or not) as a result of which the vessel is unable to trade in accordance with Charterer's directions and/or safe navigation of the vessel is endangered both parties have the option to cancel this Charter Party without liability to either party, provided no cargo is on board.

41. Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from Underwriters, by reason of the vessel being waiting off/in port for a minimum aggregated period of 30 days, provided vessel was "on hire".

42. Crew may be used for opening and closing of hatches provided shore regulations permit.

43. SURVEYS

Joint on-hire survey to be held at first load port during waiting or loading time and joint off-hire survey to be held prior to redelivery during waiting or discharge time. Costs of surveys to be shared equally between Owners and Charterers.

44. OWNER'S EXPENSES AND BUNKERS

a. Charterers to have the liberty to retain sufficient funds from the hire to cover Owner's actual or

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

anticipated disbursements maximum USD 1000 per port subject to prior advice. Charterers also have the right to deduct the estimated value of redelivery bunkers from the last hire payment. If at any time the value of redelivery bunkers is expected to exceed the estimated last hire payment under this Charter Party then Charterers have the right to deduct the value of redelivery bunkers from preceding hire payment(s).

b. All entertainment vouchers to be countersigned by the Charterer's agents/supercargo if practicable.

45. BILLS OF LADING

If required by Charterers, the Owners/Master herewith authorise the Charterers or their agents to sign on Owner's/Master's behalf, Bills of Lading as presented in accordance with Mate's receipts without prejudice to this Charter. Charterers indemnify Owners against all consequences of them or their agents signing Bills of Lading.

46. STEVEDORES

The Stevedores although appointed by Charterers are to be considered Charterer's servants and shall load, stow, dunnage and lash, trim and discharge the vessel under the control of the Master. The Master is to direct and control the loading, stowage and discharging of cargoes in co-operation with the local authorities.

47. STEVEDORE DAMAGE

Damages to the vessel caused by the Stevedores during loading and/or discharging to be repaired at Charterer's expense before redelivery to Owners if affects vessel's seaworthiness and proper workability, but Charterers not to be responsible for stevedore or other damage to the vessel if Master fails to notify Stevedores and Charterers or their agents in writing within 48 hours after occurrence except hidden damages which to be notified as soon as discovered in which case a joint survey to be held. Otherwise Charterers not to be responsible for any damage caused to the vessel, ordinary wear and tear excepted. In the case of damage which is apparent at the time of occurrence Master is obliged to hold party causing damage responsible in writing.

48. PROTECTIVE CLAUSES

The following Clauses to form part of this Charter Party: New Both-to-Blame Collision Clause, New Jason Clause,

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

Conwartime 1993 War Risk Clauses, Clause Paramount, The General Average Clause, all of which can also be included in the Bills of Lading, except that Chamber of Shipping 1 + 2 to apply to Bills of Lading in place of Baltime 1939 War Clause.

49. CLAIMS

This Charter Party is to be governed by English Law. All claims of whatsoever nature (excluding cargo claims) to be deemed to be waived and barred unless arbitration in accordance with Clause 17 is commenced within 12 months of vessel's redelivery. Any cargo claim to be settled in accordance with the Interclub N.Y.P.E. Agreement with amendments to date. Charterers to carry out a pre-loading survey, and cost to be shared equally. Charterers to forward a copy to Owners.

50. CLEANING CLAUSE

Charterers have the option to redeliver the vessel with unclean holds against paying Owners a lumpsum of USD 4,000 including removal/disposal of dunnage/lashing material.

51. OIL POLLUTION

Notwithstanding any terms or conditions stated elsewhere in this Charter Party it is warranted that during the currency of this Charter Owners will comply fully with any legislation enacted with respect to oil or other pollution (such expression to include any rules and/or regulations issued thereunder) by any government including federal, state or municipal or other division or authority thereof. In particular Owners to establish and maintain at their expense such financial security or responsibility in respect of oil or other pollution damage as may be required by any such legislation. Should any delay to the vessel or any extension of the voyage occur from failure of Owners to comply with such oil or other pollution legislation, the vessel is to be considered off-hire for the period of such delay or extension. Owners hereby accept responsibility for all the consequences and agree to indemnify Charterers against all claims, liabilities and costs (including Charterer's legal fees) which result from Owner's failure to comply fully with such oil or other pollution legislation.

52. VESSEL'S PERFORMANCE

Will be monitored by an independent weather routing company appointed by Charterers at Charterer's expense and if vessel's performance should fall short of described speed

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

as per "Description Clause" hire and bunkers to be adjusted accordingly by mutual agreement.

The independent weather routing company will, prior to vessel's departure from port, give the Master a recommended route to the next port of call and may make further recommendations during the voyage. However, the decision as to the final route selection will be the Master's. The Master will comply with the reporting procedure of the routing service selected by the Charterers.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau's reports. (The Independent Weather Routing Company). In the event of a consistent discrepancy between the deck logs and the independent weather bureau reports, the average of the two shall be taken as ruling. It is understood vessel's speed and consumption warranty is applicable only basis conditions up to and including Beaufort Force 4 and Douglas Sea State 3.

53. Deleted.

54. DISCRIMINATION

In the event of loss of time due to boycott of the vessel by shore labour or arising from government restrictions by reason of the vessel's flag or the terms and conditions by which members of the crew are employed or by reason of operation or control, vessel to be off-hire and all direct related expenses to be for Owner's account.

55. Owners to give Charterers "MUR JOHANNESBURG" - telex number 420617 - delivery notice on final fixing. (Charterers to advise further delivery notices required). Charterers to give Owners approximately 20 days followed by 15/10/7/5/3/1 days notice of redelivery.

56. CARGO EXCLUSIONS

Acids, all injurious and dangerous goods, ammonium nitrate in bulk (ammonium nitrate in bags OK), arms and ammunition, asphalt and pitch in bulk, bauxite, clay in bulk (clay in bags OK), concentrates, creosoted goods, direct reduced iron ore, explosives, ferro silicon, fishmeal, hot briquetted iron, livestock, logs, nepheline syenite, nuclear material, salt, scrap incl. MBT, silica sands, silver sand, soda ash, sulphur, toxic and/or chemical waste, urea.

Following Protective Clauses to apply:

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

Concentrates

Notwithstanding the above, Charterers have the option to load max 5000 metric tons concentrates provided same always loaded / stowed in accordance with Local / IMO Regulations / Recommendations.

Ammonium Nitrate

Charterer's option to load max 2000 metric tons ammonium nitrate in bags, IMO 5.1, UN 1942, provided same always loaded / stowed in accordance with IMO and Local Recommendations / Regulations.

Additional Clause:

IMO

Charterers have the option to load dangerous cargo except IMO Class 1+7 provided same to be loaded / stowed / secured in accordance with IMO Dangerous Goods Code and in accordance with local port authority and insurance regulations. Such dangerous cargo not to exceed 1,500 tons.

Ferro Silicon

Max 2000 metric tons ferro silicon to be allowed, provided same always loaded / stowed / discharged strictly in accordance with IMO / Local Regulations. Any additional equipment required, including portable fans for electrical ventilation, to be supplied at Charterer's time, risk and expense.

57. To Owner's knowledge the vessel is not blacklisted by Arab countries and the vessel has not called at Cuba since 1 June 1962 and has not called at North Vietnam and North Korea during the last six months.

58. TRADING EXCLUSIONS

Always within Institute Warranty Limits but excluding Amazon River, Angola, Arabian Gulf, Australia, Baltic between 15.12 and 15.5, Cambodia, CIS Pacific ports, Cuba, Eritrea, Finland, Georgia, Gulf of Aqaba, Haiti, Iceland, Iran, Israel, Lebanon, Liberia, Libya, New Zealand, N. Korea, Orinoco River, Scandinavia, Somalia, Sri Lanka, Syria, territory of former Yugoslavia, Vietnam, White Sea, Yemen, Zaire.

Charterers guarantee that they will not trade the vessel directly between PRC and Taiwan.

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

59. BUNKERS

The Charterers on delivery and the Owners at the port of redelivery shall take over and pay for all fuel remaining on board the vessel.

Bunkers on delivery about 500 metric tons IFO and about 70/80 metric tons MDO. Bunkers on redelivery about same quantities as actually on board on delivery. Prices both ends, USD 70 per metric ton IFO and USD 140 per metric ton MDO.

Value of bunkers on delivery to be paid by Charterers together with first hire.

Charterer's option to supply RMF 25 in South Africa where RME 25 is not available.

The Owners have the option to bunker for their own account prior to redelivery without hindering Charterer's operations, and Owners to advise Charterers timeously.

60. DESCRIPTION

Ship's particulars hereunder given by the Owners all deemed fully incorporated into and form part of the Charter Party dated Johannesburg 26th November, 1998.

M.V. "EMMA OLDENDORFF"

Liberian Flag
Call Sign ELOG7, Reg-No. 9550
Owners : Egon Oldendorff (Hong Kong) Limited, Hong Kong
Multipurpose tweendecker/container vessel, flush in all tweendecks except hold No. 3 where no tweendeck hatch covers, engine/bridge aft,
Built 12/1983 by Hyundai Heavy Industry Shipyard, Ulsan
First Class Korean Register
Loa 161.789M, LPP 153.4M, Breadth 26.00M
GRT 18,220 NRT 10,855
Suez Canal GRT 19,407.77 NRT 15,359.88
Panama Canal GRT 19,514.85 NRT 14,670.60
29,331.30 MTS DWAT on abt 11.515M SSW draft
(28,448.90 MTS DWAT on winter loadline 11.275M SW),
1,403,150 CBFT/1,332,994 CBFT grain/bale capacity available for cargo

| | Lower Holds Grain/Bale | Tweendeck Grain/Bale |
|---|---|---|
| No.1 | 61,154 / 58,096 | 95,950 / 91,154 |
| No.2 | 176,626 /167,794 | 239,599 /227,621 |
| No.3 | 179,148 /170,188 | 239,811 /227,822 |
| No.4 | 172,198 /163,588 | 238,664 /226,731 |

One two-cycle single acting crosshead Hyundai-B+W 5L67GBE

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

Diesel engine, direct reversible, turbocharged, of abt 7,660 BHP at abt 102 RPM
Speed/consumption : abt 14 knots
On abt 23 MTS IFO (180 CST) plus abt 1.8 MTS MDO for auxiliaries, vessel may burn MDO whilst manoeuvring in rivers, shallow waters, port limits etc.
Speed and consumption always to be basis upto and including Beaufort Scale 4 and Douglas Sea State 3.
Port consumption: abt 2.0 MTS MDO without cranes working, abt 2.6 MTS MDO with cranes working
4 Holds/4 Hatches
Hatch sizes weatherdeck and tweendeck:
No.1 : 12.80M x 10.14M
No.2-4: 25.60M x 17.55M
Hatch covers: McGregor hydraulic flush deck folding hatch covers both on weatherdeck and tweendeck (except tweendeck No.3)
Gear: electric deck cranes Tsuji Heavy Ind. 4 x 26 MTS SWL
Container capacity : 1,100 units of 20'x8'x8'6"
stowage : lower holds totally 548
Deck incl. hatch covers 552
Alternatively: 471 units of 40'x8'x8'6" plus
158 units of 20'x8'x8'6"
Intakes always subject to stability / trim / visibility / permissible weights
32 Reefer points (female) AC 450 Volt
Fittings: No cells, but fully fitted with restraint devices, lash eyes on decl incl. pertaining loose fittings and lashings

| Deck loading (strength) (all about) | Uniform MTS/M2 | TEU MTS/Stack | FEU MTS/Stack |
|---|---|---|---|
| Tanktop | 15.0 | 120 | 180 |
| Weather deck | 3.2 | 45 | 65 |
| Weather deck hatch covers | 2.2 | 45 | 65 |
| Tweendeck hatch covers | 2.8 | 45 | 65 |

Capacities : bunker abt 1,024.5 CBM IFO / abt 252.8 CBM MDO (100 P.C.)
ballast abt 8,203.5 MTS
fresh water abt 296.2 M3
Fresh water evaporator (15 MTS/day), CO2 fitted, grain fitted, holds are mechanically ventilated, Panama/Suez Canal fitted, Australia and USA fitted, nautical aids: 2 radars with one Arpa slave unit, VHF, Gyro compass, Em-Log, Satnav, weather fax.

Platfloor tanktop and tweendeck dimensions:

| L/Hold | L | BR | H |
|---|---|---|---|
| No.1 | 15.20M | 7.40 Fore/19.20 Aft | 5.60 |
| No.2 | 29.00 | 21.20/25.40 | 5.60 |
| No.3 | 29.00 | 25.40 | 5.60 |
| No.4 | 29.00 | 25.34/16.80 | 5.60 |
| T/Deck | | | |
| No.1 | 18.20 | 12.80/24.40 | 7.00 |

ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.

| | | | |
|---|---|---|---|
| No.2 | 31.60 | 24.80/25.40 | 7.00 |
| No.3 | 31.60 | 25.40 | 7.00 |
| No.4 | 30.80 | 25.40/23.40 | 7.00M |

Radio communication on board (all Inmarsat B)
Telephone : 363658110
Fax : 363658120
Telex : 363658130

All above "about" and without any guarantee but in good faith.

61. Owners confirm that vessel has not traded directly between Taiwan and CIS/People's Republic of China/Albania/North Korea or vice versa.

62. In case original Bills of Lading are not available at discharge port(s), Owners/Master are to allow discharge / release / change of destination of entire cargo against single Letter of Indemnity in Owner's standard P and I Club wording signed by Charterers only.

63. Hire not to contribute to general average.

64. Gangway Watchmen, if required by other than Master, to be for Charterer's account.

65. Charterers to pay lumpsum USD 1250.00 per month or pro rata in lieu of cables/victualling/entertaining.

66. Charterers agree that their agents will undertake, without agency fee to Owners, normal husbandry matters with Owners only paying for actual expense. Extraordinary items such as deserting, hospitalization, etcetera, the Owners are to appoint either their own agent or pay Charterer's agents according to tariffs.

67. ARBITRATION CLAUSE

If either of the appointed arbitrators refused to act or is incapable of acting or dies the party who appointed him may appoint a new arbitrator in his place. If one party fails to appoint an arbitrator either original or by way of substitution as aforesaid within seven clear days after the other party having appointed its arbitrator has served the party making default with notice to make an appointment, the party who has appointed an arbitrator is allowed to appoint that arbitrator to act as sole one in reference and his award shall be binding on both parties as if he had been appointed by consent. It is further agreed that if dispute concerns small amounts it is appropriate that the matter be referred to "Small Claims Procedure 1989" for a speedy decision on documents alone.

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

68. Deleted.

69. Deleted.

70. The Charterers may carry cargo on deck subject vessel's stability/vessel's deck strength and Master's supervision. For any cargo carried on deck, the shippers and/or the Charterers shall bear the risk. Expense and responsibility for any loss of or damage to the cargo, howsoever caused and Bills of Lading should be marked accordingly.

All Bills of Lading covering deck cargo to be marked "shipped on deck at Charterer's risk without any liability to Owners for loss of or damage to cargo and/or ship howsoever caused".

71. BUNKER CLAUSE

Charterers to supply bunkers in accordance with British Standard RME25 (for IFO 180 CST) and DMB (for MDO) supplement 'B' and the product must be composed of straight minerals only.

However, where RME25 is not available (as in S.A.), Charterers to supply RMF 25, after consultation with Owners and advice of the typical specs to be supplied.

72. MARITIME LIEN

In no event shall Charterers procure, or permit to be procured, for the vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorised representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the vessel or of her Owners, and that the furnisher claims no maritime lien on the vessel therefor.

73. DOUBLE BANKING

It has been agreed that the vessel may be loaded, lightened or partly or fully discharged from/into barge(s) at any safe anchorage without swell and/or safe berth as ordered by Charterers but always subect to Master's absolute discretion whether such loading/lightening/discharging is safe and feasible. The Master may, if he considers it at any time unsafe to commence or continue loading/lightening/discharging, order the barge(s) away from his vessel to a safe distance and such barge(s) must obey such orders. Master may also remove his vessel to a safe distance. Charterers shall supply adequate and proper fenders and securing equipment acceptable to the Master and shall also be liable for any damage caused to the vessel by the

**ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.**

barge(s) during approach, securing, lying alongside and unsecuring or departure of the barge(s) provided the Master has substantiated such damage by holding liable in writing the party responsible. Final and sole responsibility for placing of fenders shall always remain with the Master of the vessel. The Master shall at all times give full cooperation to Charterers and/or their agents to expedite the loading/discharging and shall take all responsible steps to protect his vessel from sustaining damage.

74. STOWAWAYS CLAUSE FOR TIME CHARTERS

a. i. The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

ii. If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterer's account and the Vessel shall remain on hire.

iii. Should the Vessel be arrested as a result of the Charterer's breach of Charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

b. i. If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owner's account and the Vessel shall be off hire.

ii. Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods

ADDITIONAL CLAUSES TO M.V. "EMMA OLDENDORFF" CHARTER PARTY DATED 26TH NOVEMBER, 1998.

and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

75. Final accounting of hire and disbursements to be arranged by Charterers as promptly as possible.

76. If steel products in break bulk are to be carried, Charterers to arrange both loading and discharging surveys, time and cost to be shared equally between Charterers and Owners. Owners to be at liberty to request copies of survey report from Charterers which to be made readily available as soon as possible.

77. Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a Contract of Carriage (whether or not signed on behalf of the Owners or on the Charterer's behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

78. In case ISM Regulations are altered to become applicable to tweendeckers, then ISM Clause is to apply throughout the currency of this Charter Party.

**NEW BOTH-TO-BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply:

**BOTH-TO-BLAME COLLISION CLAUSE**

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

and the Charterers shall ensure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York / Antwerp Rules, 1974, as amended 1990, and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery".

and the Charterers shall ensure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

**BIMCO Standard War Risks Clause for Time Charters, 1993.**
**Code Name: "CONWARTIME 1993"**

1.  For the purpose of this Clause, the words:

    a.  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master, and

    b.  "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.  The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.  The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

4.  a.  The Owners may effect War Risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their

Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

b. If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterer's orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

a. to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b. to comply with the order, directions or recommendations of any War Risks underwriters who have the authority to give the same under the terms of the War Risks insurance;

c. to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

d. to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e. to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.  If, in accordance with their rights under the foregoing
    provisions of this Clause, the Owners shall refuse to
    proceed to the loading or discharging ports, or any one or
    more of them, they shall immediately inform the Charterers.
    No cargo shall be discharged at any alternative port
    without first giving the Charterers notice of the Owner's
    intention to do so and requesting them to nominate a safe
    port for such discharge.  Failing such nomination by the
    Charterers within 48 hours of the receipt of such notice
    and request, the Owners may discharge the cargo at any safe
    port of their own choice.

8.  If in compliance with any of the provisions of sub-clauses
    (2) to (7) of this Clause anything is done or not done,
    such shall not be deemed a deviation, but shall be
    considered as due fulfilment of this Charter Party.

**GENERAL PARAMOUNT CLAUSE**

All the Bills of Lading issued under this Charter Party shall contain the following Clause:

> "This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of Goods by Sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability".

METALL UND ROHSTOFF SHIPPING RSA (PTY) LTD.
MUR
TEL : (2711) 302-0000
FAX : (2711) 883-1545
TLX : 420617
EMAIL : shipping@mur.co.za
187 RIVONIA ROAD
MORNINGSIDE, SANDTON, 2196
P. O. BOX 8370, JOHANNESBURG, 2000

## *SWORN STATEMENT*

1. *My name is Melpomeni Petersen and I am employed as Marine Claims Handler by Metall Und Rohstoff R.S.A. (Pty) Ltd. ("MUR"). I have been employed by MUR since 01st April 1999, and have served in my current position with MUR since 01st April 1999.*

2. *I have reviewed all files maintained by MUR in connection with a voyage of the M/V EMMA OLDENDORFF from Durban, South Africa to New Orleans, Louisiana, U.S.A. from 31 December 1998 through 27 January 1999, pursuant to a New York Produce Exchange form time charter party dated 26 November 1998 between Egon Oldendorff (Hong Kong), Ltd ("Oldendorff"), as owner, and MUR, as charterer. Based on my review of those files, I have personal knowledge of all matters set forth herein.*

3. *At no time following discharge of the various cargoes from the M/V EMMA OLDENDORFF in New Orleans in January 1999 did MUR, or any of its agents or representatives, grant Cargill Ferrous International ("Cargill"), or any of its agents or representatives, or Oldendorff, or any of its agents or representatives, any extensions of time in which to file suit against MUR for damage to or shortage of any cargo carried aboard the M/V EMMA OLDENDORFF on the voyage referred to above, including but not limited to the cargoes carried under Bills of Lading Nos. 8, and 9.*

4. *A true and correct copy of the 26 November 1998 charter party between Oldendorff and MUR is attached hereto as Exhibit "A". This document is maintained in MUR's files in the course of its regularly conducted business activity, and I have access to and custody of those files and the attached charter party. The charter party requires, at Clause 17, Lines 107-109, that any dispute between Oldendorff and MUR shall be referred to arbitration in London.*

5. *I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

*Executed this 31st day of January 2001 at Sandton, South Africa.*

*MELPOMENI PETERSEN*

**NOTICE OF CONFIDENTIALITY**
The information contained in this message may be of a private and confidential nature and is intended for the addressee only. Should you receive this communication in error please contact the sender and destroy the original and any copies thereof. If you are not the intended recipient you are not at liberty to disclose any information contained herein to any other party.

DIRECTORS: G. FLETCHER (ZIMBABWE), R. M. MUIRHEAD (BRITISH), L. W. PRICE, K. AMBAK (DANISH), D. P. LEIGH, I.B. NEL

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CARGILL FERROUS INTERNATIONAL, A DEPARTMENT OF CARGILL INCORPORATED** | * | **CIVIL ACTION** |
| | * | **NO. 00-0247** |
| **VERSUS** | * | **SECTION "C"** |
| **M/V EMMA OLDENDORFF, HER ENGINES, TACKLE, APPAREL, ETC., *IN REM*, OLDENDORFF B. COASTAL CARGO CO., AND GOLDEN STEVEDORES, *IN PERSONAM*** | * | **MAGISTRATE (2)** |
| | * | **JUDGE BERRIGAN** |
| | * | **MAG. WILKINSON** |

**STATEMENT OF UNCONTESTED MATERIAL FACTS**

**NOW INTO COURT**, through undersigned counsel comes Metall und Rohstoff Shipping RSA (PTY) Limited ("MUR"), making only a limited appearance with a full reservation of all rights, defenses and exceptions, and submits the following list of uncontested material facts, which facts shall be deemed uncontested solely for the purposes of the attached motion:

1. Plaintiff herein, Cargill Ferrous International, a Department of Cargill Incorporated ("plaintiff"), alleges damage to a cargo of prime newly produced hot rolled deformed bars that were loaded aboard the M/V

EMMA OLDENDORFF at Durban, South Africa on or about 31 December 1998. (Complaint (Doc. 1) at ¶7).

2. The said cargo was discharged from the EMMA OLDENDORFF in New Orleans, Louisiana on or about 27 January 1999. (Id., ¶8).

3. Plaintiff did not sue MUR within one year of the delivery of the cargo.

4. Defendant/third-party plaintiff, Egon Oldendorff (Hong Kong) Limited ("Oldendorff"), filed its third-party complaint against MUR, in which it tendered MUR to the plaintiff pursuant to Rule 14(c) of the Federal Rules of Civil Procedure, on 19 December 2000, more than one year after the cargo was delivered.

5. MUR did not grant plaintiff or Oldendorff any extensions of time to file suit more than one year after the cargo was delivered (see Sworn Statement of Melpomeni Peterson, attached hereto, at ¶3).

6. At the time of the voyage at issue in this suit, MUR had time chartered the M/V EMMA OLDENDORFF from Oldendorff pursuant to a New York Produce Exchange form time charter party dated 26 November 1998. (Id., ¶4, and Exhibit "A" thereto).

7. The charter party, at Clause 17, Lines 107-109, states that "any dispute" between Oldendorff and MUR "shall" be arbitrated in London. (Id.).

Respectfully submitted,

MURPHY ROGERS & SLOSS

Peter B. Sloss #17142
Suite 400, One Shell Square
701 Poydras Street
New Orleans, Louisiana 70139
Telephone: (504) 523-0400
Attorneys for third-party defendant, Metall und Rohstoff Shipping RSA (PTY) Limited

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have on this 31st day of January 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, either by hand, by telefax or by placing same in the United States Mail, properly addressed, and first class postage prepaid.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CARGILL FERROUS INTERNATIONAL, A DEPARTMENT OF CARGILL INCORPORATED** | * | **CIVIL ACTION** |
| | * | **NO. 00-0247** |
| **VERSUS** | * | **SECTION "C"** |
| **M/V EMMA OLDENDORFF, HER ENGINES, TACKLE, APPAREL, ETC., *IN REM*, OLDENDORFF B. COASTAL CARGO CO., AND GOLDEN STEVEDORES, *IN PERSONAM*** | * | **MAGISTRATE (2)** |
| | * | **JUDGE BERRIGAN** |
| | * | **MAG. WILKINSON** |

**NOTICE OF HEARING**

**TO:** All Parties

**PLEASE TAKE NOTICE** that Metall und Rohstoff Shipping RSA (PTY) Limited ("MUR"), made third-party defendant herein, will bring the attached Motion for Summary Judgment to Dismiss Rule 14(c) Tender and to Stay or Dismiss Third-Party Complaint Pending Arbitration on for hearing before United States District Judge Helen G. Berrigan on the 28th day of February 2001 at 9:30 a.m., or as soon thereafter as counsel may be heard.

Respectfully submitted,

MURPHY ROGERS & SLOSS

Peter B. Sloss #17142
Suite 400, One Shell Square
701 Poydras Street
New Orleans, Louisiana 70139
Telephone: (504) 523-0400
Attorneys for third-party defendant, Metall und Rohstoff Shipping RSA (PTY) Limited

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I have on this 31st day of January 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, either by hand, by telefax or by placing same in the United States Mail, properly addressed, and first class postage prepaid.